And also I want to welcome Thomas Edison, CTE High School coming here on a snowy day to learn about the court system. I hope you guys have a good field trip. All right, Mr. Stinson, I see you reserved two minutes for rebuttal and you can begin whenever you're ready. Thank you, Your Honor. Good morning. The issue before this court is whether the district court erred in granting summary judgment on statute of limitations ground on the appellant's CERCLA cost recovery case. The court made three critical findings in granting the motion and all of which we've appealed, two of which I'd like to address this morning. The first is the question of whether what is referred to as... Just hold on one second. Can we just stop the time? I just want to let the students leave. All right, I apologize. Go ahead. Thank you. The first issue is whether or not what are referred to as the 2007 IRMs are a removal or a medial action under CERCLA. The court decided those were remedial actions and we think the court erred there. In order to make the analysis, which courts do regularly on this issue, we need to look at the factual context of where this work occurred. This work occurred, the 2007 IRMs, under the 1999 consent order with the State of New York. That order simply required the appellant, and I'm going to use appellant as you recognize there's a complicated corporate history here, appellant or ELG to mean one party. Appellant was obligated to perform a remedial investigation feasibility study under CERCLA in accordance with the national contingency plan. That order also obligated the State of New York to issue a record of decision or a ROD, which is the mechanism to formalize remedy selection. Well, let me just... I mean, I think you know this is in the briefs that we've said multiple times in Schaefer and YSEG that you don't have to have an IRM in order for it to be considered remediation. And the district court cited a number of different things that led it to conclude that this was remediation rather than removal, including that it involved excavation, storage, and removal of the contaminated soil, which is in the definition of remediation under CERCLA, that it was at the source of contamination in the soil and ground water at the site. It wasn't downstream, which is some of the other cases. And it wasn't something that was immediate, that it had been there a long time, going all the way back to the 1970s, and that based upon those particular things concluded that this was remediation and not removal. So why is that long? The question is the national contingency plan and the RAFS, which is memorialized in the order, require the decision maker to issue a record of decision which formalizes the remedial action. As we know, there's typically one remedial action. Now, the court in 2020 with the NPM case, we'll talk about that in a minute, but there is typically one remedial action at a Superfund site. The question becomes if those that the RIMs, which were limited, which were not comprehensive, certainly were not permanent, and they certainly did end what was going on at the site, if that is the remedial action, it begs the question, what is the rod going to be, which is the statutory and regulatory mechanism to issue a decision on a final remedial action? What are we going to call that? The conclusion that in this context where you have an order obligating the RAFS, obligating the state to issue the record of decision, in that context, it's irreconcilable to call the actions in the 2007 IRMs the remedial action for the site. I think the analysis is consistent with what the court did in the first of three sites in the first energy case, which is the 2004 case. That was the case, that was the Plattsburgh case, and the issue there was there was an excavation project, targeted excavation product in a discrete area, just as this was in our case. Twenty years later, there was the record of decision. The remedy was formalized, was issued, and the court properly, in my judgment, looked at that and said the question was whether the earlier IRMs, the earlier excavation work, constituted a remedial action. The court said no, it didn't. The rod that followed 20 years later, that's the remedial action. How is this different from the MPM case? How is this distinguishable? Well, that brings me to the second argument that I wanted to make, which is this. If you want to conclude that this is, if you do uphold the district court and conclude that this, the 2007 IRMs are a remedial action, the next question is whether or not to apply the single remediation principle. That's the principle I just alluded to a moment ago. There's one remedial action in each case. We think there's very solid reasons, as this court talked about in the MPM case, which was the single remediation principle shouldn't apply, or we should certainly look at it, in situations where doing so would defeat the statutory design, would defeat the statutory objectives. And that's exactly what calling the 2007 IRMs a remedial action does. Right, this is the same source and the same contaminant all along, right? Would you agree with that? This is the same source and the same contaminant throughout? The same general operations, correct. All right. So how does that undermine the principle? Your client knew very early on what the source, what the contaminants was, and who else might be responsible. In fact, they cite various internal communications where a conscious decision was made. We don't want to sue these people. They're good customers. So I don't understand, even from the standpoint you're arguing from, of why this would trouble us. Pardon me. I think that goes to the question of fairness. But what the MPM court said is there's an opportunity for more than one remedial action, and that should be the case here. If we're going to call the remedial action the 2007 IRMs, what are we going to call the broad one when the government issues it, which is the formal remedy selection? The only way to make this consistent with the remedy selection process in CERCLA is to have more than one remedial action. Let me ask this. I want to be sure I'm clear. When, under your theory, does the statute run? When does the clock start? The statute has not run. The statute on a removal action- Theoretically. Theoretically, when would it start? If it's a removal action, that is the 2007 IRMs, which is part of the removal phase, which we contend it is, the statute would begin to run three years after the completion of the removal action. And what puts your client and other potential responsible parties on notice? What allows them to figure out when that date is? This is not a question of what we knew and when we knew and how much knowledge we had. It's solely the question of when does the removal action end on a removal action. And if it's a removal action, it's six years from the beginning of on-site construction. The district court held that it was a remedial action. The on-site construction began and ended in 2007. We, therefore, were obligated to initiate litigation in 2013. We didn't. We were, therefore, out of time. We don't believe that was a remedial action. But if you do, that gets us to the question of the single remediation principle. That is, there's room for more than one remedial action. And we think there has to be. If we're going to make the 2007 IRMs a remedial action, we have to call the remedy that's emanating from the RIFS process, which is the ROD, which is the formal remedy selection. In NPM, we said successive remedial steps undertaken in furtherance of the original objective are part of the single remediation for purposes of the statute of limitations. Isn't that exactly what we have here? Successive remedies dealing with the same issue. These contaminants and these soil over time. Yes, but it's not. It does not convert the removal action into a remedial action. And it doesn't change that the process that is enshrined in the order and the national contingency plan is that the remedy is selected in the ROD. The remedy isn't even known. It's the birth child of the RIFS process, which we are still in the middle of. All right. You have two minutes for rebuttal, and let's hear from your adversaries. Mrs. Rowe? Good morning, Your Honors. My name is Kristen Rowe, and I represent Apelli General Electric Company, but I am offering argument on behalf of all Apelli's. This case concerns a site in Utica, New York, that was found to be contaminated back in 1977 as a result of historical recycling operations at that facility dating back to the 1950s. The district court properly held that CERCLA's six-year statute of limitations was triggered by its 2007 cleanup that addressed that same contamination that had been discovered 30 years earlier, specifically the excavation and off-site disposal of about 700 tons of contaminated soil and nearly 7,000 gallons of contaminated groundwater. During the past 50 years, the appellant has done... I think the time on our clock here... During the past 50 years, the appellant has done everything in its power to try to delay fully investigating and remediating this site, which in turn has delayed the issuance of a record of decision, what we commonly refer to as a ROD. And the ROD sets forth all the components of a final remediation action plan and often refers to the components that have already taken place. Even now, in 2025, the appellant still has not fully... has not done enough to enable the issuance of a ROD for any portion of the site, so under appellant's argument, the statute of limitations still, after 50 years, hasn't started to run. That can't possibly be. Appellant is basically seeking to capitalize on its delay to argue, we don't know enough for you to apply the statute of limitations against us. Well, the time passage doesn't really matter, right? I mean, you would agree that if they just sat on their hands and didn't do anything to clean it up, the statute wouldn't have started to run, right? It's only because there was a remediation action, so I guess I'm not really sure about the whole 1977 argument. Well, you're correct. The reason I'm bringing up the delay is because it ultimately goes to the fairness issue. Because they're saying, their argument is, it's not fair for you to apply the statute of limitations against us because we don't know enough. And the reason they don't know enough is because of their delay. If you cause part of the contamination to begin with, I mean, you could go back to first order business of, I don't know, fairness. It seems like nobody here is really able to invoke the mantle of fairness when it comes to contaminating an industrial site. So I wanted to focus on whether it's remediation or removal. Okay, fair enough. The statutory language says that CERCLA's six-year statute of limitations is triggered if four conditions are satisfied. The initiation of the physical on-site construction of the remedial action, with remedial action being an action consistent with permanent remedy. Those four conditions were satisfied by the 2007 cleanup. Because that cleanup involved the physical on-site excavation of contaminated soil, which was then transported by truck off the site. To accept Appellant's argument, you basically have to rewrite CERCLA. You have to rewrite the statute of limitations provision, and you have to rewrite the definition of remedial action. And this court recognized that fact in the Schaefer case. The 2007 cleanup was consistent with permanent remedy because it permanently removed contamination. And remedial action in CERCLA is defined, specifically includes as examples of remedial action, excavations in off-site transport and disposal, which is exactly what happened in 2007. And this court has made a distinction between remedial actions and removal actions by focusing on where the remediation is taking place. A remedial action typically is at the source area, whereas a removal addresses contamination at its end point. And another critical distinction is the time-sensitive nature of the action. A remedial action is not a time-sensitive action, whereas a removal action is in response to an imminent threat or emergency situation. There was no imminency here, and this gets to the delay. They found the contamination in 1977. They didn't put the shovels in the ground until 30 years later. And even then it was after several years of coordination with the D.C. So the district court probably held that the 2007 cleanup was remedial because it was consistent with permanent remedy, it addressed contamination at its source, it was not a time-sensitive action, and it was an action that is specifically listed as an example of remedial action in the statute itself. And that brings us to the single remediation principle, which as this court noted in NPM silicones, is applied in the great majority of cases. Of circle cases. The application of that principle was fair because the appellant here has known of the site-wide contamination since the 1980s. And it has known of DEC's demand that it remediate the entire 23 acres since the 1980s. There was nothing that precluded this appellant from bringing a timely action for past and future costs. It just failed to do so. There was nothing that prevented it from doing so. And as this court noted during the appellant's argument, litigation against the defendants was contemplated in the 80s. They knew about their ability to go after the defendants in the 1980s and specifically chose not to. So we don't have the same fairness concerns in this case that we had in NPM. Thank you, Ms. Rowe. We are now from Ms. D'Agostino. Thank you. Good morning, your honors. May it please the court. Mary D'Agostino on behalf of Special Medals, we're one of the co-appellees. We get the benefit of federal rule of appellate procedure 28I and joining the remaining appellees' brief as well as argument. I'm just here to focus the court in on one particular undisputed set of facts as it applies to Special Medals because it can factor into the court's analysis, both with respect to the application of the single remediation principle, but also the spoliation issue. And that's the 2002 bankruptcy that Special Medals filed in connection with the Eastern District. It was in the Eastern District of Kentucky. And in the context of that proceeding, which was five years before the 2007 remedial action, 12 years before the document destruction that was added to, ELG submitted certified claims in that proceeding, protecting its rights to pursue environmental costs against Special Medals. And then after that bankruptcy was discharged, it also sent insurance letters in 2005 to Special Medals insurance carriers, again preserving its rights to bring this type of action against them for environmental remediation costs. Those particular set of undisputed facts undermine ELG's arguments here and weigh in favor of affirming the court's decision below. There is some suggestion by ELG that we're suggesting some sort of per se rule in the context of bankruptcy that if someone submits a claim, it necessarily implies that someone's on notice of litigation. That's not what we're suggesting. At the end of the day, CERCLA is not legal in nature. It's equitable in nature. And this particular set of undisputed facts is another reason that the court should affirm below, unless the court has any other questions regarding our brief I addressed on our papers. All right. Thank you. Thank you. Okay, Mr. Stinson, you have two minutes to rebuttal. Thank you. On the issue of fairness, it is true the issue of fairness has no bearing on the question of whether the 2007 RRMs are deemed a removal or remedial action. But it is relevant to the question of whether the single remediation principle should apply. And that's what this court said in NPM. And specifically, what the district court said was, in the case today, is that it wouldn't be unfair to not apply the principle because ELG knew of its customers. It knew about this situation for a long time and could have brought a lawsuit earlier. And I cannot dispute that. But the broader context of fairness here needs to take into account in this analysis what exactly is going on here. What has happened is one party, at the end of the day, has stood up to do something about this problem. These folks have ignored pleas from the state, or not all of them, some of the defendants from the state. They've ignored our pleas. We, at last I count, were in excess of $15 million we spent. We haven't even got to the true remedial action portion of the case, which won't flow until the rod is issued. And what happened in this case is our lawsuit was limited to what was called the universal waste parcel, which the district court held was one of two parcels. The second one was the Utica alloys. So the district court held that there's one facility under CERCLA that includes both of those smaller sites. Our lawsuit and the IRMs that we perform are limited to the universal waste site, the larger parcel over here. We don't even seek our costs at the Utica alloy site. We don't even seek costs over here at the universal waste site until beginning in 2012. And yet in response to this lawsuit, the defendants have glommed on to the fact that there was this other action. And even though they're not suing us for them, and even though it's not the same site, they're not the same location, let's make the argument that they should have sued us, and they should have sued us earlier than they did. So the fairness here is the brunt of the.